```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/13/2022
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**Glenda Lee Martes Estrada,**

                        **Plaintiff,**

            **-against-**

**Commissioner of Social Security,**

                        **Defendant.**

**21-cv-00153 (SDA)**

**OPINION AND ORDER**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE:**

Plaintiff Glenda Lee Martes Estrada ("Estrada" or "Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") that denied her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Compl., ECF No. 2.) Presently before the Court are the parties' cross-motions, pursuant to Federal Rule of Civil Procedure 12(c), for judgment on the pleadings.[1] (Comm'r Not. of Mot., ECF No. 19; Pl.'s Not. of Mot., ECF No. 28.)

For the reasons set forth below, the Commissioner's motion is DENIED and Plaintiff's cross-motion is GRANTED to the extent that it seeks remand for further administrative proceedings.

---

[1] Although Plaintiff now is represented by counsel, at the time the Commissioner filed her motion, Plaintiff was *pro se* and therefore, in accordance with the Scheduling Order, the Commissioner filed her motion for judgment on the pleadings first.

## BACKGROUND

### I.      Procedural Background

On January 30, 2018, Estrada filed applications for DIB and SSI, with an alleged disability onset date of September 1, 2017. (Administrative R., ECF No. 16 ("R."), 15.) The Social Security Administration ("SSA") denied her applications on May 21, 2018 and, thereafter, Estrada filed a written request for a hearing before an Administrative Law Judge ("ALJ"). (R. 105, 115.) On July 10, 2019, Estrada appeared for a hearing before ALJ Kimberly Schiro. (R. 55-74.) Estrada was represented at the hearing by attorney Jose Vasquez. (R. 55.)

On March 10, 2020, a supplemental hearing was held before ALJ Schiro at which vocational expert ("VE") Peter Manzi testified. (R. 76-82.) VE Manzi previously had completed vocational interrogatories in response to a request from the ALJ. (R. 335, 353-57.) The purpose of the supplemental hearing was so that Plaintiff's counsel could question VE Manzi regarding his interrogatory responses. (R. 79.) In response to questions from counsel, VE Manzi testified that his responses to interrogatory 7(c) meant that an individual who was off-task 15 percent of the day or absent two to three days per month would be precluded from all work. (R. 80-81.)

In a decision dated March 27, 2020, ALJ Schiro found Estrada not disabled. (R. 15-32.) On or about April 20, 2020, Estrada requested review of the ALJ decision from the Appeals Council. (R. 4, 233.) Her request was denied on November 18, 2020, making ALJ Schiro's decision the Commissioner's final decision. (R. 1-3.) This action followed.

II.    **Non-Medical Evidence**

Born on July 24, 1975, Estrada was 42 years old on the alleged onset date. (*See* R. 83.)
Estrada completed one year of college. (R. 278.) Between at least October 2010 and September
1, 2017, Estrada worked part time as a supervisor at Kmart. (R. 278, 295.)

III.   **Medical Evidence Before the ALJ**

A.    **Physical Impairments**

In March 2016, Estrada began seeing Dr. Julio Ramirez, M.D., at Jerome Medical Office for
primary medical care. (R. 855.)  Estrada saw Dr. Ramirez on April 25, 2016 for a routine physical
examination (R. 813-14) and then not again until October 27, 2017, at which time she presented
for a follow-up examination after living in Puerto Rico. (R. 815.) Dr. Ramirez diagnosed Estrada
with functional dyspepsia. (*Id*.) On November 13, 2017, Estrada saw Dr. Ramirez with her chief
complaints being sore throat and fever. (R. 816.) Dr. Ramirez assessed chronic sinusitis and
dysuria (painful urination). (R. 816.) Estrada saw Dr. Ramirez for a follow-up visit on December 1,
2017, where he assessed anxiety disorder and started her on Sertraline HCl tablets, as well as on
medication for dysuria. (R. 817.)

During a follow-up visit on January 3, 2018, Dr. Ramirez completed a general examination
and assessed insomnia in addition to anxiety disorder. (R. 818.) Dr. Ramirez increased Estrada's
dose of Sertraline HCl from 25 mg to 50 mg; started her on Temazepam for insomnia and started
Estrada on Imitrex, a medication to treat migraines. (*See id*.) Dr. Ramirez also referred Estrada to
Fernando Taveras, M.D. P.C. for an evaluation for depression, anxiety and insomnia. (R. 399-400.)

On March 8, 2018, Dr. Ramirez increased Estrada's dose of Sertraline HCl to 100 mg. (R.
820.) On March 20, 2018, Estrada saw Roland Gandeza at Bronx ProTherapy Rehabilitation for a

physical therapy initial evaluation, on referral from Dr. Ramirez. (R. 660.) Estrada reported pain in her neck that had started two years earlier, after she underwent surgery for cancer, and that the pain and limitation of motion had been worsening since onset. (*Id*.)

During a follow-up visit on April 13, 2018, Dr. Ramirez noted that Estrada was short of breath on exertion. (R. 821.) He also completed a depression screening, which indicated mild depression. (*Id*.) On April 24, 2018, an x-ray of the cervical spine was performed by Dr. Gregory Wilde at Lenox Hill Radiology at the request of Dr. Ramirez. (R. 559, 602.) Dr. Wilde noted cervical spine straightening and moderate disc space narrowing. (*Id*.) On May 2, 2018, Estrada underwent an MRI of the brain, on referral from Dr. Ramirez, due to complaints of severe dizziness and headaches. (R. 619.) Dr. Marc Katzman of Stand-Up MRI Of The Bronx, P.C. identified no intracranial abnormality. (*Id*.) During a follow-up visit on May 23, 2018, Dr. Ramirez assessed lateral epicondylitis of the left elbow[2] and "[o]ther specified dorsopathies" in the cervical region. (R. 822.)

Estrada saw Dr. Ramirez for an annual physical on July 15, 2018. (R. 823-25.) A depression screening was negative. (R. 823.) A review of systems indicated that Estrada was negative for, among other things, dizziness, joint stiffness or pain, depression, anxiety and sleep disturbance. (*Id*.) On physical examination, Dr. Ramirez noted normal findings, including with respect to Estrada's back, lower and upper extremity joints, cervical and lumbar spine and neck and on neurological examination. (R. 824.) However, under assessment, Dr. Ramirez noted "abnormal

---

[2] Lateral epicondylitis, commonly known as "tennis elbow," occurs when tendons in the elbow swell due to trauma or repeated stress. *See Abualteen v. Saul*, No. 19-CV-02637 (DF), 2020 WL 5659619, at *2 n.9 (S.D.N.Y. Sept. 23, 2020).

findings" and assessed myalgia. (R. 825.) He started Estrada on Methocarbamol tablets, Benzonatate and Flonase. (*Id*.)

During a follow-up visit on August 27, 2018, Dr. Ramirez assessed obesity. (R. 826.) A note from September 27, 2018, indicated that Dr. Ramirez discontinued Sertraline HCl and assessed a Body Mass Index ("BMI") of between 33.0 and 33.9. (R. 828-29.) Estrada saw Doctor of Physical Therapy ("DPT") Gandez for physical therapy on October 8, 2018. (R. 603-04.) DPT Gandez assessed pain, reduced range of motion and muscle weakness in the cervical muscles, as well as difficulty performing activities of daily living such as dressing upper garments and lifting and carrying objects. (R. 603.)

On October 10, 2018, Estrada saw Dr. Femar Themistocle for a pain management consultation, on referral from Dr. Ramirez. (R. 605.) Estrada reported left elbow pain and lower back pain that was getting progressively worse, as well as pain in the left knee. (*Id*.) Her main complaint was lower back pain, which radiated to her lower extremities. (*Id*.) Estrada reported that her pain was alleviated with heat and was exacerbated by cold, walking, sitting or standing too long. (*Id*.) On examination of her neck/cervical spine, the Spurling's test was positive bilaterally and Dr. Themistocle noted diffuse tenderness and spasm and that flexion, extension and rotation were painful. (R. 606.) With respect to the lumbar spine, Dr. Themistocle also noted diffuse tenderness and spasm, painful flexion, extension and rotation, positive Patrick's tests on the left and right and positive straight leg raising at 30 degrees bilaterally. (R. 606-07.) He further

noted limited range of motion in the bilateral upper and lower extremities and painful range of motion in the left elbow and left knee. (*Id*.)

Dr. Themistocle referred Estrada for an MRI of the cervical and lumbar spine and the left elbow. (R. 607.) Dr. Themistocle encouraged Estrada to pursue mental health counseling and engage in an exercise regimen, but noted that she should avoid heavy lifting. (*Id.*) Dr. Themistocle diagnosed chronic pain syndrome, lumbosacral neuritis, myalgia, myositis, lumbago, cervicalgia, cervical radiculitis, post laminectomy cervical, knee pain, elbow pain and hypertension. (*Id.*) For treatment, Dr. Themistocle recommended selective nerve root block injections, possible cervical and lumbar radio frequency treatment, cervical epidural steroid injections, possible left knew injection and EMG/NCV of the upper and lower extremities. (R. 607-08.) In addition, he prescribed compounded pain medication, tramadol and cylobenzadine. (R. 608.)

On October 22, 2018, Dr. Stephen Hershowitz of Stand-Up MRI Of The Bronx, performed an MRI of Estrada's cervical and lumbar spine on referral from Dr. Themistocle. (R. 537-40.) Dr. Hershowitz found disc bulging, a disc herniations, mild stenosis, minimal degenerative disease and straightening of the cervical spine. (R. 538, 540.) Dr. Themistocle saw Estrada for a follow-up appointment on October 23, 2018. (R. 609.) He noted that she was attending physical therapy with some relief and that her pain was reduced on medication. (*Id.*) Dr. Themistocle refilled Estrada's medications for pain control and indicated that she should return in a few weeks for review of her MRI results and reevaluation. (R. 609-10.)

On November 8, 2018, Dr. Steven Winter of Stand-Up MRI Of The Bronx, performed an MRI of Estrada's left knee, on referral from Dr. Themistocle. (R. 617-18.) Dr. Winter noted chondromalacia with diffuse involvement of the medical patellar facet extending nearly to the

cortical bone, a small amount of synovial fluid, blunting and radial tearing at the lateral meniscus body and strain of the medial collateral ligament attachment site on the femur. (*Id.*) During a routine follow-up appointment on November 26, 2018, Dr. Ramirez assessed cervicalgia and referred Estrada to pain management to evaluate her based on chronic upper back pain. (R. 832-33.)

On November 28, 2018, Estrada saw Physician Assistant ("PA") Octavian Mihai at Medalliance Medical Health Services for evaluation and treatment of persistent neck and back pain, on referral from Dr. Ramirez. (R. 760-63.) PA Mihai noted tenderness and spasms with restricted range of motion in both the cervical and lumbar spine, positive Spurling's test and positive straight les raising. (R. 760-61.) He assessed radiculopathy of the lumbar and cervical regions and noted that Estrada should consider EMG/NCV of the upper and lower extremities and lumbar and cervical epidural injections. (R. 761-62.) Supervising physician Dr. Ali Guy, M.D., also signed the treatment note. (R. 762.)

Estrada returned to Medalliance for a follow-up appointment on December 12, 2018. (R. 756-59.) PA Mihai indicated that, contrary to his prior note, Estrada had not done physical therapy of the lumbar spine but only for the cervical spine, which was "not helping." (R. 756.) PA Mihai and Dr. Guy recommended that Estrada start lumbar physical therapy and schedule cervical trigger point injections, which she agreed to do. (R. 758.) Dr. Guy administered the first of six trigger point injections on December 27, 2018. (R. 754.) He also recommended a trial pain cream for the lumbar spine. (*Id.*)

On January 2, 2019, Estrada saw Registered Physical Therapist ("RPT") Ruchi Shah at Medalliance for a physical therapy evaluation and treatment. (R. 688-90.) RPT Shah recommend

that she continue physical therapy twice per week for six weeks. (R. 690.) Estrada continued to attend physical therapy throughout January. (R. 686-87 (January 4, 2019), 682-83 (January 16, 2019), 684-85 (January 18, 2019), 680-81 (January 22, 2019), 678-79 (January 28, 2019).) On January 14, 2019, Estrada saw Dr. Ramirez for an annual examination. (R. 838-40.) A depression screening indicated mild depression. (R. 838.) Dr. Ramirez's general examination findings were normal. (R. 839.) Throughout January 2019, and concluding on February 7, 2019, Estrada also underwent the remaining cervical trigger point injections. (R. 748-51 (January 3, 2019), 744-47 (January 10, 2019), 740-43 (January 17, 2019), 736-39 (January 31, 2019), 731-35 (February 7, 2019).) During the January 31, 2019 visit, Dr. Guy also prescribed a lidocaine patch. (R. 738.)

On February 13, 2019, Dr. Ramirez completed another evaluation titled annual visit/annual examination. (R. 842-44, *see also* R. 853-54.) Dr. Ramirez's general examination findings were the same as in January, though he added an assessment for anxiety disorder, unspecified. (R. 843.) During a follow-up visit with PA Mihai and Dr. Guy on February 21, 2019, they noted that they were awaiting approval for lumbar trigger point injections. (R. 727-30.) They also noted that the series of six cervical trigger point injections provided greater than 80 percent pain relief. (R. 727.) On February 28, 2019, Dr. Guy administered trigger point injections of bilateral lumbar paraspinals. (R. 723-26.) Dr. Guy also recommended that she schedule EMG/NCV of the lower extremities and follow-up in one week. (R. 724-25.)

On March 6, 2019, Dr. Guy performed EMG studies of Estrada's upper extremities, which he concluded revealed evidence of bilateral cervical radiculopathy. (R. 571-74, 649-50, 717-18, 768-71.) During a follow-up visit on March 7, 2019, PA Mihai and Dr. Guy noted that Estrada was doing lumbar physical therapy and that the single round of lumbar trigger point injections

resulted in greater than 80 percent pain relief. (R. 781-84.) Dr. Guy prescribed cyclobenzaprine and naproxen and recommended that Estrada follow-up in two weeks. (R. 783.) Estrada continued to attend physical therapy for her cervical spine over the next several weeks. (R. 670-71 (March 15, 2019), 674-75 (March 16, 2019), 676-77 (March 11, 2019), 672-73 (March 30, 2019).)

On March 21, 2019, Dr. Guy performed nerve conduction studies of the lower extremities, which he concluded was normal with no electrical evidence of peripheral neuropathy. (R. 651-52, 714-16.) During a follow-up visit on March 27, 2019, PA Mihai and Dr. Guy scheduled Estrada for her first cervical epidural injection and recommended that she follow up in two weeks. (R. 712.) Estrada saw Dr. Ramirez again the next day, complaining of pain in her right wrist after falling. (R. 845-46.) Dr. Ramirez referred Estrada for an MRI and prescribed medication for hypertension and pain and referred Estrada to a nutritionist for evaluation related to obesity. (R. 846.)

On April 4, 2019, Estrada saw Dr. Guy for EMG studies of the lower extremities, which he concluded revealed electrical evidence of a bilateral L4 through S1 radiculopathy. (R. 569-70, 647-48, 661-62, 708-09, 764-67.) On April 8, 2019, Estrada underwent an MRI of the right wrist at Fordham Radiology, on referral from Dr. Ramirez. (R. 795.) The MRI showed no evidence of fracture and no acute bone abnormality. (*Id*.) Estrada saw PA Mihai and Dr. Guy for a follow-up visit on April 10, 2019 during which they noted that she was awaiting her first lumbar epidural injection and was scheduling her first cervical epidural injection. (R. 704-07.) On April 19, 2019, Estrada received a caudal epidural injection at Avicenna Ambulatory Surgery Center. (R. 658.)

On April 25, 2019, Dr. Ramirez saw Estrada for a follow-up visit. (R. 849-50.) Estrada complained of pain in her right wrist, worsening pain in her back and bruises on her arm. (R. 849.)

Dr. Ramirez noted that Estrada was in a motor vehicle accident on April 5, 2019, and was under orthopedic care. (R. 850.) On April 29, 2019, PA Mihai and Dr. Richard Gasalberti, M.D., noted that Estrada has completed the first lumbar epidural with 70 to 75 percent pain relief and improved function and was awaiting her first cervical epidural. (R. 699-700, 702-03.) During a follow-up evaluation on May 8, 2019, PA Mihai and Dr. Gasalberti noted that Estrada continued to experience lower back pain radiating to the lower extremities and neck pain radiating to the upper extremities, but that she been stable on her current regiment and reported being able to function well on her current medications. (R. 695.) They also noted that Estrada had to reschedule her first cervical epidural injection due to being hypoglycemic that morning and that she should schedule lumbar trigger point injections and follow-up in two weeks. (R. 695-96.) On May 21, 2019, Estrada underwent MRIs of the lumbar and cervical spine, which showed no significant changes from the prior MRIs in October 2018. (R. 798-801.) Estrada saw PA Mihai and Dr. Gasalberti again on June 3, 2019. (R. 691-94.) They refilled her prescriptions for cyclobenzaprine, gabapentin, lidocaine and naproxen and noted she still was awaiting her first cervical epidural. (R. 693.)

On June 7, 2019, Estrada saw Dr. Stephen Lund, M.D. of the Sleep Disorders Institute for a sleep study. (R. 803-11.) Dr. Lund diagnosed obstructive sleep apnea, psychophysiological insomnia and obesity and recommended treatment by means of nasal continuous positive airway pressure, upper airway surgery or the use of a dental appliance. (R. 803.) The same day, Estrada saw Dr. Ramirez for a follow-up visit. (R. 851-52.) Dr. Ramirez assessed obesity, spinal stenosis in the cervical region, disc displacement in the lumbar region and carpal tunnel syndrome. (R. 852.)

Dr. Ramirez noted that Estrada was scheduled for bariatric surgery on July 19, 2019. (*Id.*) On June 19, 2019, Estrada received a cervical epidural at Avicenna Ambulatory Surgery Center. (R. 653.)

**B.    Mental Impairments**

Beginning in February 2018, Estrada received psychiatric care from Dr. Yvanka Pachas, M.D. and Licensed Clinical Social Worker ("LCSW") Khandia Geronimo at Fernando Taveras, M.D. P.C. (R. 484, 518.) Dr. Pachas conducted an intake evaluation of Estrada on February 20, 2018. (R. 518-20.) Dr. Pachas noted that Estrada had symptoms of a panic disorder, including a history of panic attacks, and symptoms of a depressive disorder. (R. 518.) Dr. Pachas also noted that Estrada had been receiving treatment for depression and anxiety in Puerto Rico. (*Id.*) Upon examination, Dr. Pachas noted that Estrada presented as sad looking and tense and noted signs of moderate depression. (R. 519.) Dr. Pachas found that Estrada's cognitive functioning, short-and-long-term memory and judgment were intact and her insight into problems was fair. (*Id.*) Dr. Pachas noted signs of anxiety, including that Estrada was easily distracted. (*Id.*) Dr. Pachas also noted that Estrada was cooperative. (*Id.*) Dr. Pachas diagnosed major depressive disorder, recurrent, severe without psychotic features and recommended that Estrada continue individual therapy and medication management. (*Id.*) Dr. Pachas continued Estrada on Lorazepam and re-started her on Sertraline. (*Id.*)

Dr. Pachas saw Estrada again on March 6, 2018 for a refill of her prescriptions. (R. 521-22.) Dr. Pachas noted no side effects reported and that Estrada was at "baseline" and remained worried about her current situation. (R. 521.) Dr. Pachas noted that Estrada was sad looking and appeared anxious. (*Id.*) As with her prior examination, her cognitive functioning was in the normal range. (*Id.*) Dr. Pachas's recommendation remained the same as the prior visit. (*Id.*)

On March 13, 2018, Estrada saw LCSW Geronimo for the first time for psychotherapy. (R. 523.) Estrada reported not sleeping at night and feeling irritable. (*Id*.) At her next session on March 27, 2018, Estrada presented as very anxious and irritable. (R. 524.) Estrada reported that her medications were not helping her symptoms and she was having mood swings, sleep disturbances and poor concentration. (*Id*.) On April 5, 2018, Estrada reported no significant change in her mood. (R. 525.) A clinical summary from May 22, 2018, noted Estrada's diagnoses of major depressive disorder and panic disorder and indicated that Estrada was taking Alprazolam, Lexapro and Propanolol. (R. 526.)

Estrada next saw Dr. Pachas on January 8, 2019. (R. 628.) An evaluation indicated that Estrada was mildly depressed, which Dr. Pachas noted as "clearly improved[,]" with mild anxiety. (R. 629.) Dr. Pachas started Estrada on Buspirone and recommended that she continue with individual therapy and medication management. (*Id.*)

During a follow-up visit on June 11, 2019, Dr. Pachas noted that Estrada recently had been diagnosed with sleep apnea, but she was able to maintain behavior under control and her mood was calm. (R. 917-18.) On June 25, 2019, Estrada saw LCSW Geronimo for psychotherapy, where they discussed Estrada's upcoming bariatric surgery. (R. 919.) On July 9, 2019, Dr. Pachas noted that Estrada remained stable and reported similar observations to her prior visit. (R. 920-21.) On August 21, 2019, Dr. Pachas noted that Estrada had undergone bariatric surgery and lost weight and that she was concerned about her disability evaluation, but reiterated she was able to maintain behavior and her mood was clam. (R. 922-23.) On September 5, 2019, during a visit with LCSW Geronimo, Estrada reported feeling good physically and emotionally. (R. 924.) On September 17, 2019, Dr. Pachas also noted that Estrada was doing well following her surgery and

that she had no new complaints. (R. 925-26.) During a visit with LCSW Geronimo on October 3, 2019, although Estrada reported that everything was going well following her surgery, she also reported problems sleeping and that she was not sleeping at all despite taking her medications. (R. 927.) On November 8, 2019, Dr. Pachas noted that Estrada recently had had a panic attack on the subway and was anxious on examination. (R. 928-29.)

On November 14, 2019, Estrada reported to LCSW Geronimo that she had undergone hand surgery and was in a lot of pain. (R. 930.) At her next appointment, on December 5, 2019, Estrada reported that her wounds had not healed and that she was feeling down with low motivation. (R. 931.) Dr. Pachas' note on December 18, 2019 indicated that Estrada was calm and included no new findings. (R. 932-33.) On January 9, 2020, Estrada reported to LCSW Geronimo that she was feeling weak after losing weight and was walking with a cane and experiencing severe body aches, including back pain. (R. 934.)  The following week, on January 14, 2020, Dr. Pachas indicated that Estrada was anxious and depressed. (R. 935-36.)

**C.**  **Medical Opinions**

       **1.**  **March 3, 2018 Psychiatric Consultative Examination – Dr. Seth Sebold, Ph.D.**

On March 3, 2018, Estrada saw Dr. Seth Sebold for a psychiatric consultative examination. (R. 412-16.) Estrada reported problems sleeping, loss of appetite and depressive symptoms, including dysphoric mood, concentration problems and irritability. (R. 412.) She further reported anxiety in crowds and closed spaces and that she avoided going outside and using public transportation when crowded. (R. 413.) Estrada described having panic attacks on a daily basis and experiencing mood swings. (*Id*.) She reported hearing a voice telling her to look in a certain

direction, but then no one is there. (*Id.*) She also reported paranoia and short-term memory problems. (*Id.*)

Upon examination, Dr. Sebold found Estrada to be cooperative with adequate manner of relating, social skills and overall presentation. (R. 413.) Dr. Sebold noted that Estrada, who utilized an interpreter, did not provide significant detail when asked about her symptoms. (*Id.*) Dr. Sebold noted that Estrada's dress and grooming were appropriate, but she appeared anxious and was fidgety and visibly shaking during the examination. (*Id.*) Dr. Sebold noted that Estrada's affect and mood were mildly anxious and her attention, concentration and recent and remote memory skills were mildly impaired. (R. 414.) Dr. Sebold found that Estrada's cognitive functioning was average to below average and her insight and judgment were fair. (*Id.*)

Dr. Sebold noted that the results of Estrada's mental status evaluation were not consistent with her vocational history as a supervisor, but that her performance during the examination may have been secondary to anxiety and nervousness at the time. (R. 414-15.) Regarding her mode of living, Dr. Sebold noted that she cooked with help, did laundry and shopped. (R. 415.) He also noted that Estrada did not socialize much and mostly spent her day isolated in her apartment, though she did try to go out. (*Id.*)

Dr. Sebold found that Estrada had no limitations in understanding, remembering or applying simple or complex directions and instructions; using reason and judgment to make work-related decisions; sustaining an ordinary routine and regular attendance at work; maintaining personal hygiene and appropriate attire; or in awareness of hazards and taking appropriate precautions. (R. 415.) Dr. Sebold found that Estrada had moderate limitations in interacting adequately with supervisors, co-workers and the public; sustaining concentration and

performing at a consistent pace; and regulating emotions, controlling behavior and maintaining well-being and that these difficulties were caused by psychiatric symptoms. (*Id*.) Dr. Sebold concluded that the results of the examination appeared to be consistent with psychiatric problems, which may significantly interfere with Estrada's ability to function on a daily basis. (*Id*.) Dr. Sebold recommended that Estrada continue psychiatric intervention. (*Id*.)

### 2.    April 2018 Letter/July 2018 Medical Source Statement – Dr. Ramirez

In April 2018, Dr. Ramirez submitted a letter stating that Estrada had been under his medical care for the past two years, that, at the time, she was "exhibiting shortness of brea[th] on exertion," and should "limit her excessive physical activity until further notice." (R. 483.)

On July 16, 2018, Dr. Ramirez completed a Physical Medical Source Statement Questionnaire regarding Estrada. (R. 528-31.) Dr. Ramirez noted a diagnosis of cervical spine pain, which he described as "constant pain in upper back" and selected impaired sleep, tenderness and abnormal posture as positive objective signs. (R. 528.) Dr. Ramirez opined that Plaintiff could walk one block; sit for thirty minutes at a time for a total of about two hours in an eight-hour working day; and stand for thirty minutes at a time for a total of about two hours in an eight-hour working day. (R. 529.) Dr. Ramirez further opined that Estrada would need unscheduled periods of walking around approximately every thirty minutes; would need to be able to shift positions at will and take unscheduled breaks approximately every four hours. (*Id*.) With respect to lifting and carrying, Dr. Ramirez opined that Estrada could rarely lift and carry 10 pounds and never lift or carry 20 or 50 pounds. (R. 530.) He also opined that she could rarely twist, stoop, crouch or climb ladders or stairs. (*Id*.) Dr. Ramirez opined that Estrada would likely be absent from work more than four days per month. (R. 530-31.) In addition, Dr. Ramirez opined that

depression and anxiety contributed to the severity of Estrada's symptoms and functional limitations and those psychological conditions frequently interfered with her attention and concentration. (R. 531.)

### 3.    June 2018 Letter/August 2018 Medical Source Statement/January 2019 Psychosocial Assessment – LCSW Geronimo

On June 26, 2018, LCSW Geronimo wrote a letter noting Estrada's diagnoses and indicating that Estrada was "not able to travel by public transportation due to her inability to be around big crowds and this situation[] exacerbates her symptoms." (R. 560.)

On August 2, 2018, LCSW Geronimo completed a Medical Source Statement regarding Estrada. (R. 532-36.) LCSW Geronimo stated Estrada's diagnoses as major depressive disorder, recurrent severe without psychotic symptoms, panic disorder and episodic anxiety. (R. 532.) LCSW Geronimo listed Estrada's medications as Propranolol, Alprazolam and Lexapro and noted side effects of dizziness, drowsiness, upset stomach and lethargy. (*Id*.) For clinical findings, LCSW Geronimo noted that Estrada was irritable and sad and needed ongoing treatment. (*Id*.) LCSW Geronimo opined that Estrada had moderate restrictions in activities of daily living; marked and/or severe difficulties in social functioning; marked deficiencies in concentration, persistence and pace; and would experience three episodes of decompensation within a 12-month period. (R. 533.) LCSW Geronimo found that Estrada had "limited, but satisfactory" ability to understand, remember and carry-out very short and simple instructions and maintain regular attendance and be punctual. (R. 534.) For the remaining abilities, including remembering work-like procedures, maintaining attention for two hour segments, sustaining an ordinary routine, performing at a consistent pace, accepting instructions from supervisors and getting along with co-workers or peers, LCSW Geronimo found that Estrada was "seriously limited, but not precluded." (*Id*.) LCSW

Geronimo went on to opine that Estrada would be absent from work about four days per month. (R. 535.)

In a Psychosocial Assessment on January 10, 2019, LCSW Geronimo reiterated Estrada's history and medications and noted under current social functioning that she was able to go to medical appointments but not be around big crowds. (R. 566-68; *see also* R. 625-27.)

### 4.   June 2019 Medical Source Statement – Dr. Pachas[3]

In a Medical Source Statement, dated June 7, 2019, Dr. Pachas opined that Estrada had marked limitations in activities of daily living and social functioning and moderate limitations in concentration, persistence and pace. (R. 578.) Dr. Pachas opined that Estrada was "unable to meet competitive standards" in her ability to remember work-like procedures, get along with co-workers and peers, respond appropriately to changes in a work setting and deal with normal work stress. (R. 579.) She further opined that Estrada was "seriously limited, but not precluded" in multiple other areas, including understanding and remembering very short and simple instructions, maintaining attention for two-hour segments, working in coordination with or proximity to others, completing a normal workday or workweek without interruption from symptoms, and accepting instructions and criticism from supervisors. (*Id*.) Dr. Pachas opined that Estrada's impairments or treatment would cause her to be absent more than four days per month. (R. 580.)

---

[3] Dr. Pachas also completed an assessment on May 8, 2018, in which she noted that Estrada's condition stabilized with medication, but if she stopped taking medication she would decompensate. (R. 485.) Dr. Pachas also checked the box indicating that Estrada was unable to work. (*Id*.) The record appears to include only the last page of this form and it is not discussed by the ALJ.

     **5.**     <u>August 9, 2019 Orthopedic Examination – Dr. Ann Marie Finegan, M.D.</u>

On August 9, 2019, Estrada underwent an orthopedic examination by consultative examiner Dr. Finegan. (R. 903-13.) Estrada described the pain she had been experiencing after falling at work two years before. (R. 903.) She reported having good days, but that on bad days she was unable to pick up a coffee cup or stand for five minutes and needed help with all daily activities. (R. 903, 905.)  On physical examination, Dr. Finegan noted that Estrada had a normal gait, normal station, was able to walk on heels and toes without difficulty, was able to perform a full squat and had a normal station. (R. 905.) Dr. Finegan further noted that Estrada came in with a cane, but that it was not medically necessary. (*Id*.; *see also* R. 909.) Estrada did not need help changing for the exam or getting on or off the exam table and was able to rise from a chair without difficulty. (R. 905.)

Dr. Finegan noted that Estrada had intact hand and finger dexterity, 5/5 grip strength, full cervical range of motion, no trigger points, pain, or spasm and full strength in her upper extremities, but reported diminished sensation to light touch on her right hand involving the fourth and fifth digits only. (R. 905-06.) For the thoracic and lumbar spine, Dr. Finegan noted full range of motion, no tenderness or spasm, negative straight leg raising test and no trigger points. (R. 906.) She had 5/5 strength in the lower extremities, no sensory abnormality, normal reflexes, and no joint effusion or instability. (*Id*.)

Dr. Finegan opined that Estrada should not perform any tasks which would require being able to identify objects by touch using the right hand. (R. 906.) Dr. Finegan further opined that Estrada could continuously lift and carry up to 20 pounds and occasionally up to 50 pounds; could sit for 2 hours at a time up to 8 hours total; could stand or walk for 2 hours at a time up to 6 hours

total. (R. 908-09.) Due to numbness in her right hand of unknown etiology, Dr. Finegan opined

that Estrada could never feel with her right hand, but otherwise had continuous use of her hands

and feet. (R. 910.) Estrada could frequently perform postural activities; occasionally could be

exposed to various environmental conditions; and frequently could be exposed to loud noise. (R.

911-12.) Dr. Finegan also opined that Estrada could perform a variety of physical activities. (R.

913.)

### 6.   August 9, 2019 Psychiatric Consultative Evaluation – Dr. Elizabeth Kronk, Psy.D.

On August 9, 2019, Estrada underwent a second psychiatric consultative examination

conducted by Dr. Elizabeth Kronk, Psy.D. (R. 894-98.) Estrada reported difficulty sleeping,

depressive and anxiety symptoms and problems with short term memory and concertation. (R.

894-95.) On mental status examination Dr. Kronk found that Estrada was cooperative, but had

difficult describing her medical and psychiatric issues and appeared anxious. (R. 895-96.) Dr.

Kronk noted that Estrada's attention and concentration and recent and remote memory skills

were mildly impaired; her intellectual functioning appeared to be below average; and her insight

and judgment were fair. (R. 896.)

Dr. Kronk concluded that Estrada had no limitations in her ability to understand,

remember and apply simple or complex directions; her ability to use reason and judgment to

make work-related decisions; or her ability to sustain an ordinary routine and regular attendance

at work. (R. 897.) Dr. Kronk opined that Estrada was moderately limited in interacting with others;

in maintaining concentration and pace; and in her ability to regulate her emotions, control

behavior and maintain well-being. (*Id*.) A Medical Source Statement by Dr. Kronk reiterated these

limitations. (R. 899-901.)

**IV.**     **The Administrative Hearings**

Estrada first appeared with counsel for an administrative hearing before ALJ Schiro on July 10, 2019. (R. 55-74.) Estrada testified that she stopped working due to medical reasons, including dizziness, and that she was dizzy "pretty much all the time" and used a cane. (R. 63.) Estrada also testified regarding her back problems and that she experienced radiating pain to her legs, arms and hands. (R. 64, 68.) Estrada testified that she had a lot of pain in her lower back when sitting and could only walk about one block before feeling like she had to rest. (R. 64.) Estrada testified that she was scheduled to have surgery on her wrist for carpal tunnel and had been in a car accident in April 2019 and hurt her back and arms. (R. 64-65.) With respect to her treatment, Estrada testified that the epidural injections she received for back pain did not provide relief and that, if the next three injections still did not provide relief, her doctor would recommend surgery. (R. 65-66.) As for her psychiatric impairments, Estrada testified that she had been seeing a psychiatrist for about two years, which she started doing after she tried to harm herself. (R. 66.) She testified that she experienced panic attacks when she was around a lot of people and did not take trains or buses. (R. 66-67.) Regarding her daily activities, Estrada testified that she primarily stayed home and watched television and that her daughter and husband helped her with cooking, cleaning and laundry, but she could do some of it herself. (R. 67-68.)

Estrada's attorney asked her about symptoms related to her back, and she testified that she had pinched nerves that caused headaches and dizziness and that the pain radiated from her neck through her arms and legs. (R. 68.) Estrada further testified that she had been experiencing dizziness for about two years and had once fallen while on the job. (R. 69, 72.)  Estrada also

testified that she felt sleepy almost all day; could not lift or carry something weighing 10 pounds due to pain and could walk about one block before she needed to stop and rest. (R. 73.)

Estrada appeared with counsel for a supplemental administrative hearing before ALJ Schiro on March 10, 2020. (R. 76-82.) Prior to the hearing, Vocational Expert ("VE") Manzi responded to interrogatories proffered by the ALJ and the purpose of the hearing was for Estrada's counsel to question the VE. (R. 78.) Estrada's attorney asked the VE to clarify his response to interrogatory 7(c) regarding work absences. (R. 80.) The VE testified that being off-task 15 percent and/or missing two to three days of work per month would preclude Estrada from being able to satisfy competitive employer standards. (R. 80-81.)

## V.    ALJ Schiro's Decision And Appeals Council Review

Applying the Commissioner's five-step sequential evaluation, *see infra* Legal Standards Section II, the ALJ found at step one that Estrada had not engaged in substantial gainful activity since September 1, 2017, the alleged onset date. (R. 18.) At step two, the ALJ determined that Estrada had the following severe impairments: degenerative disc disease of the cervical and lumbar spine, degenerative joint disease of the left knee, carpal tunnel syndrome, chronic venous insufficiency, obesity, anxiety, depression, and panic disorder. (*Id*.) In addition, the ALJ determined that Estrada had the following non-severe impairments: pleomorphic adenoma, obstructive sleep apnea, and hypertension. (R. 18-19.)

At step three, the ALJ found that Estrada did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 19.) The ALJ specifically considered Listings 1.02, 1.04, 4.11, 12.04 and 12.06. (*Id*.) The ALJ discussed the "paragraph B' criteria" and found that Estrada

had moderate limitations in understanding, remembering or applying information; interacting with others; concentrating, persisting or maintaining pace; and adapting or managing oneself. (R. 19-20.) Accordingly, the ALJ found that the paragraph B criteria were not satisfied. (R. 20.) The ALJ also considered whether the "paragraph C" criteria were satisfied, but found that the evidence failed to establish the presence of those criteria. (*Id*.)

The ALJ then assessed Estrada's RFC and determined that she was able to perform light work, except that she could never climb ladders, ropes or scaffolds or work around hazards, including moving mechanical parts and unprotected heights; could occasionally climb ramps and stairs, and occasionally balance, kneel, stoop, crouch and crawl; needed a five-minute stretch break for every hour of sitting; could perform simple, routine tasks, with occasional contact with coworkers and supervisors, but could not have direct work-related contact with the public; could work around others, but not on teams or in collaboration with others; could make simple decisions and adapt to occasional changes in essential work tasks; could never feel with her right hand; could occasionally reach overhead with the bilateral upper extremities and could frequently finger/handle with the bilateral upper extremities. (R. 21.)

At step four, the ALJ found that Estrada has no past relevant work. (R. 30.) At step five, the ALJ considered Estrada's age, education, work experience and RFC and, based on interrogatory responses and testimony from the VE, concluded that there were jobs existing in significant numbers in the national economy that Estrada could perform, including collator operator, laundry sorter and photocopying machine operator. (R. 30-31.) Therefore, the ALJ found that Estrada was not disabled during the relevant period and denied her claim for benefits.

(R. 31.) Following the ALJ's decision, Estrada sought review from the Appeals Council, which denied her request on November 18, 2020. (R. 1-3.)

## LEGAL STANDARDS

## I.   Standard Of Review

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am., Local 537*, 47 F.3d 14, 16 (2d Cir. 1994) (citing Fed. R. Civ. P. 12(c)). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

"The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-04518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision[.]" *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009); *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987). A court must set aside legally erroneous agency action unless "application of the correct legal principles to the record could lead only to the same conclusion," rendering the errors harmless. *Garcia v. Berryhill*, No. 17-CV-10064 (BCM), 2018 WL 5961423, at *11 (S.D.N.Y. Nov. 14, 2018) (quoting *Zabala v. Astrue*, 595 F. 3d 402, 409 (2d Cir. 2010)).

Absent legal error, the ALJ's disability determination may be set aside only if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). However, "[t]he substantial evidence standard is a very deferential standard of review—even more so than the clearly erroneous standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder *would have to conclude otherwise*." *Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), *as amended* (Apr. 30, 2019) (summary order) (emphasis in original) (citation and internal quotation marks omitted). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

## II.    Determination Of Disability

A person is considered disabled for benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In determining whether an individual is disabled, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 [(the "Listings")] . . . and meets the duration requirement, we will find that you are disabled.

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (internal citations omitted).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

After the first three steps (assuming that the claimant's impairments do not meet or medically equal any of the Listings), the Commissioner is required to assess the claimant's RFC "based on all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R. §§ 404.1520(e), 416.920(e). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999) (citation omitted). It is only after the claimant proves that she cannot return to work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given the claimant's RFC, age, education and past relevant work experience. *Id.* at 50-51.

III.   **Regulations Regarding Consideration Of Medical Opinions And Prior Findings For Applications Filed On Or After March 27, 2017**

Under the regulations applicable to Plaintiff's claim, the ALJ considers five factors in evaluating the persuasiveness of medical opinions: (1) supportability; (2) consistency; (3) relationship of the source with the claimant, including length of the treatment relationship, frequency of examination, purpose of the treatment relationship, extent of the treatment relationship and whether the relationship is an examining relationship; (4) the medical source's specialization; and (5) other factors, including but not limited to "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA] disability program's policies and evidentiary requirements." 20 CFR §§ 404.1520c(c), 416.920c(c).

Using these factors, the most important of which are supportability and consistency, the ALJ must articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." *Id.* §§ 404.1520c(b), 416.920c(b).

With respect to the supportability factor, the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 CFR §§ 404.1520c(c)(1), 416.920c(c)(1). As to the consistency factor, the regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* §§ 404.1520c(c)(2), 416.920c(c)(2). While the ALJ "may, but [is] not required to, explain how [he] considered" the factors of relationship with the claimant, the medical source's specialization, and other factors, the ALJ "*will* explain how [he] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings." *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2) (emphasis added). An ALJ must provide sufficient explanation to allow a reviewing court to "trace the path of [the] adjudicator's reasoning[.]" *Amber H. v. Saul*, No. 20-CV-00490 (ATB), 2021 WL 2076219, at *6 (N.D.N.Y. May 24, 2021) (quoting *Revisions to Rules Regarding the Evaluation of Medical Evidence* ("*Revisions to Rules*"), 2017 WL 168819 (F.R.), 82 Fed. Reg. 5844-01, at *5858 (Jan. 18, 2017) ("We expect that the articulation requirements in these final rules will allow a . . . reviewing court to trace the path of an adjudicator's reasoning[.]")).

**DISCUSSION**

The Commissioner argues that the Court should affirm the ALJ's decision because it applied the correct legal standards and was supported by substantial evidence. (Comm'r Mem., ECF No. 20, at 15-25.) In her cross-motion, Plaintiff argues, *inter alia*, that the ALJ failed to properly evaluate certain medical opinions and that the RFC determination is not supported by substantial evidence. (Pl.'s Mem., ECF No. 29, at 9-24.)

**I.     The ALJ's Evaluation Of The Medical Opinion Evidence**

Plaintiff argues that the ALJ improperly evaluated the opinions of Dr. Ramirez, LCSW Geronimo and Dr. Pachas. (Pl.'s Mem. at 9-17.) For the reasons set forth below, the Court agrees.

The ALJ noted that Dr. Ramirez "support[ed] [his] opinion with treatment records," but determined that the opinion was not persuasive because "the degree of debilitating functional limitation he described, including sitting/standing/walking for only two hours in an eight-hour day, along with extensive time off task, [was] inconsistent with the generally conservative course of treatment that provided significant benefit." (R. 29.) However, if, as the ALJ noted, Dr. Ramirez's opinion was supported by evidence in the treatment records, it is difficult to determine how the ALJ found it inconsistent with the course of treatment (directed in large part by Dr. Ramirez himself), without the ALJ impermissibly imposing her own view "that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered." *See Balotti v. Comm'r of Soc. Sec.*, No. 20-CV-08944 (RWL), 2022 WL 1963657, at *6 (S.D.N.Y. June 6, 2022) (ALJ erred in assessment of supportability and consistency factors by discounting medical opinion based on type of treatment ordered) (citing *Shaw v. Chater*, 221 F.3d 126, 134-35 (2d Cir. 2000)). The Court's review is further constrained by the fact that the ALJ does not cite

to the specific medical evidence that supported Dr. Ramirez's opinion or explain her conclusion that the treatment was "conservative." *See James W. v. Kijakazi*, No. 20-CV-00954 (DJS), 2022 WL 685288, at *5 (N.D.N.Y. Mar. 8, 2022) (although ALJ may consider conservative course of treatment as one relevant factor, ALJ must provide explanation as to why course of treatment is deemed conservative); *see also Scognamiglio v. Saul*, 432 F. Supp. 3d 239, 249-50 (E.D.N.Y. 2020) (contrasting a treatment consisting of "prescription drugs . . . physical therapy, and epidural steroid injections" with the "far more benign regimens" the Second Circuit has deemed conservative).

Similarly, to the extent the ALJ found Dr. Ramirez's opinion inconsistent with records indicating that Estrada's spinal injections, bariatric surgery and wrist surgery provided "significant benefit" (R. 27), the ALJ does not explain why those records, which appear to be from the spring of 2019 or later, rendered Dr. Ramirez's opinion inconsistent for the entire period at issue, or how they were inconsistent with Dr. Ramirez's opinion regarding Estrada's off-task percentage.[4] (*See* R. 29.) Moreover, as Plaintiff points out, the ALJ also does not address later contrary evidence that her pain continued even after she received some relief from trigger point injections and the first cervical epidural. (*See* Pl.'s Mem. at 11-12.) Notably, in July 2019, Estrada testified that the epidural injections she received for back pain did not provide relief and that, if the next

---

[4] Again, the ALJ does not cite to specific treatment records, relying instead on her earlier recitation of the medical evidence. (R. 29.) Accordingly, the Court is left to guess at what specific evidence the ALJ found inconsistent with various aspects of Dr. Ramirez's opinion. Although an ALJ need not "repeat substantially similar factual analyses[,]" *see Candy A. O. v. Kijakazi*, No. 20-CV-00766 (DEP), 2022 WL 226804, at *5 (N.D.N.Y. Jan. 26, 2022), the Court must be able to "trace the path of an [ALJ]'s reasoning." *Revisions to Rules*, 2017 WL 168819 (F.R.), 82 Fed. Reg. at 5,858; *see also Kimberly C. o/b/o J.N.L., Jr. v. Comm'r of Soc. Sec.*, No. 20-CV-01033 (GLS), 2022 WL 958126, at *2 (N.D.N.Y. Mar. 30, 2022) ("In explaining how he considered the supportability and consistency factors, an ALJ must point to specific evidence in the record supporting those findings.") (alterations omitted).

three injections still did not provide relief, her doctor would recommend surgery. (R. 65-66.) For these reasons, the Court finds that the ALJ's assessment lacks a "clear discussion of the evidence implicating the supportability or consistency (or lack thereof)" of Dr. Ramirez's opinion, which "frustrates meaningful review." *See Lisa T. v. Kijakazi*, No. 20-CV-01764 (SVN), 2022 WL 2207613, at *7 (D. Conn. June 21, 2022).

The Court finds that the ALJ's assessment of the opinions of Dr. Pachas and LCSW Geronimo similarly was flawed. The ALJ found the opinions of Dr. Pachas and LCSW Geronimo to be unpersuasive, stating that the opinions were supported by treatment records, but were inconsistent with Estrada's conservative course of treatment and with the clinical observations of record, as discussed in the context of the "paragraph B" criteria. (R. 29-30.) However, as with Dr. Ramirez, the ALJ does not explain her basis for stating that the opinions were both supported by treatment records and inconsistent with the course of treatment provided by the same medical providers.[5] Moreover, the ALJ does not identify what other "clinical observations of record" she found inconsistent with the opinions of Dr. Pachas and LCSW Geronimo. Although the ALJ points back to her "paragraph B" analysis, her discussion of the treatment records at step three also lacks any specific citations to the record, but appears to rely, at least in part on treatment records from Dr. Pachas and LCSW Geronimo. (R. 20; *see also* R. 25.) The Court finds that the ALJ's failure to differentiate between the treatment records that supported the opinions

---

[5] The Court notes that the only psychiatric treatment records discussed by the ALJ are from Dr. Pachas and LCSW Geronimo. (R. 22-25.)

of Dr. Pachas and LCSW Geronimo and the clinical records she found inconsistent with those opinions frustrates meaningful review.[6]

Without a more fulsome explanation of why the ALJ rejected the opinions of Estrada's treating providers, the Court "is not in a position to review whether the ALJ's conclusions are supported by substantial evidence."[7] *See Lisa T.*, 2022 WL 2207613, at *8. Nor does the record compel only one conclusion. *See id*. (noting that application of erroneous legal principles would be harmless if record compelled only one conclusion). Accordingly, remand is required. *See, e.g.*, *Balotti*, 2022 WL 1963657, at *8 (errors in assessment of supportability and consistency factors required remand); *Rivera*, 2020 WL 8167136, at *17 (ALJ's failure to adequately explain supportability or consistency factors required remand).

## II.   <u>Nature Of Remand</u>

The Court finds that remand for further administrative proceedings is the proper remedy in this case so that they ALJ may reconsider the medical opinion evidence. *See Nicole L. v. Kijakazi*, No. 20-CV-01576 (NAM), 2022 WL 160274, at *10 (N.D.N.Y. Jan. 18, 2022) (remanding for further administrative proceedings when "further findings and development of the record would help to assure proper disposition of the claims") (citing *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999)). This is not the rare case where a remand for the payment of benefits would be appropriate, as the evidence in the present record "does not unequivocally support a finding of disability." *See*

---

[6] The Commissioner argues that "the ALJ found that the treatment records on which they relied to support their opinions were inconsistent with their opinion[s]" (Comm'r Mem. at 25 (citing R. 29-30)), but the treatment records cannot both support the opinions and be inconsistent with them. At the very least, such a finding muddles the two factors, which are meant to be addressed separately. Thus, the Commissioner's argument only highlights the need for further articulation from the ALJ.

[7] As such, I do not address Plaintiff's remaining arguments.

*Martin v. Comm'r of Soc. Sec.*, No. 20-CV-01003 (AT) (SDA), 2020 WL 8224884, at *4 (S.D.N.Y.

Dec. 21, 2020), *report and recommendation adopted*, 2021 WL 197429 (S.D.N.Y. Jan. 20, 2021).

## **CONCLUSION**

For the reasons set forth above, the Commissioner's motion (ECF No. 19) is DENIED and

Plaintiff's cross-motion (ECF No. 28) is GRANTED to the extent that it seeks remand for further

administrative proceedings. The Clerk of Court is directed to enter judgment and close this case.

**SO ORDERED.**

Dated:          New York, New York
                August 13, 2022

STEWART D. AARON
United States Magistrate Judge